No. 14,742.

RICE v. MARLAR.
(108 P. [2d] 868)

Decided December 2, 1940. Rehearing denied January 6, 1941.

58

Messrs. BLOUNT, JANUARY & YEGGE, for plaintiff in error.

Mr. ROBERT J. KIRSCHWING, Mr. JOHN F. MUELLER, for defendant in error.

*In Department.*

MR. JUSTICE OTTO BOCK delivered the opinion of the court.

THIS is an action by plaintiff in error, plaintiff below, against W. F. Marlar, who conducts a taxicab business under the name of Bill's Cab Company, and one Bethune, his employee, a taxi driver, for damages sustained by plaintiff and resulting, as it is alleged, from an assault upon him by Bethune. We here are concerned only with the liability of Marlar, who, it is admitted, is a common carrier of passengers. After plaintiff rested his case, counsel for Marlar moved for a nonsuit, which was granted and judgment entered dismissing the complaint as to him. Plaintiff is here by writ of error and seeks reversal.

██ A motion for a nonsuit admits the truth of plaintiff's evidence and every inference of fact that can legitimately be drawn therefrom, and the evidence must be interpreted most strongly against the defendant. *Baldwin Star Coal Co. v. Quinn,* 46 Colo. 590, 105 Pac. 1101; *Denver City Tramway Co. v. Wright,* 47 Colo. 366, 107 Pac. 1074; *Mulford v. Nickerson,* 76 Colo. 404, 232 Pac. 674.

Briefly, plaintiff's evidence is as follows: On the evening of the alleged assault, plaintiff, after having dinner

with some friends at the Hall Hotel in Denver, and while walking home, was struck by an automobile at the intersection of Broadway and Fourth avenue, as a result of which he suffered a broken bone in his right wrist. Immediately thereafter he went to a drug store near by and attempted, unsuccessfully, to reach several doctors. Failing in this, he proceeded to a nearby cafe and drank some whiskey, in an effort to relieve the severe pain which he was suffering because of his broken wrist. After remaining there about twenty minutes he engaged the defendant taxicab driver in question, whose taxi was standing in front of the cafe at the time, to take him to a doctor in the Orient Hotel, requesting the driver to wait for him so as to take him to his home, the agreed charge for this service being $1.50 per hour. He told the taxi driver about the accident and his injured right wrist, and during the conversation took sixty cents from his lefthand trousers pocket, which he gave the driver, telling him that he had some more money in the pocket on his "bad-arm side" and would give him the balance when the journey ended. Thereupon the taxicab driver conveyed plaintiff to the Orient Hotel, where they arrived at about 12:20 o'clock in the morning. After the taxi had stopped, before the door was opened, and thereafter, the following occurred, as narrated by plaintiff at the trial: "He [Bethune] said 'You better give me the rest of that money.' He said 'You might be up there longer than you expect.' I said 'You can come up. It is in my bad-arm pocket and I can't get it out.' He says 'I will get it out for you.' And I was getting out of the car by that time and walked over to the curb, and he put his arm on my shoulder or forearm here and said 'I will get it for you.' I said 'No, you will not get my money.' Well, before I got out of the car he said 'I am going away. I have to run over to a place for about ten minutes,' and I said 'Well, you can come up with me, if you want to.' He said 'No, I will get it out' the second or third time, I think the second; I am sure of that.

I said 'No'—because he insisted and I was rather provoked at the pain I had, and I said 'No,' and he said 'You must think I am a God damned highjacker.' Q. That is what he said to you? A. Yes. And I said 'Well, your partner, Johnnie, knocked an old man out and robbed him of $5.00 and went to the penitentiary, seventy-six years old,' and then he struck me just that quick (indicating). I never saw it coming, and knocked me down. Q. Where were you standing when he struck you? A. I just stepped up on the curbing."

Plaintiff further testified that immediately thereafter the taxi driver, wielding a blackjack, struck him a number of times on the left arm, in the face and on the head. Very shortly thereafter a police officer picked plaintiff up from the curbing, in a semi-conscious and bleeding condition.

█ Under these facts, the question presented for determination concerns the liability of Marlar as a common carrier and the sufficiency of the evidence of plaintiff to justify a submission of the case to the jury.

In *Bleecker v. Colorado & Southern R. R. Co.*, 50 Colo. 140, 143, 114 Pac. 481, we had occasion to pass upon the question of common-carrier liability arising under somewhat similar circumstances to those presented in the case at bar. In the opinion we stated: "The contract of carriage, as evidenced by a railroad ticket, not only requires the carrier to exercise legal care in conveying the passenger to his agreed destination, but, in addition, the law imposes upon the carrier the obligation to absolutely protect the passenger against the misconduct of those employed to execute such contract. In other words, the contract evidenced by such ticket not only calls for safe carriage, but for respectful and decorous treatment at the hands of the employees of the carrier acting within the general scope of their employment. Thompson on Negligence, secs. 3185-3186; *N. J. Steamboat Co. v. Brockett*, 121 U.S. 637."

While in the instant case the contract of carriage was oral and there was no ticket involved, the obligation which the law imposes upon the carrier is the same. This obligation is very well expressed in Blashfield's Cyclopedia of Automobile Law and Practice, vol. 4, page 55, section 2216, as follows:

"The carrier-passenger relationship imposes on the taxicab operator the obligation to protect the passenger from insult or assault not only by outsiders, but by his own servants as well. Thus far the passenger has a right to the absolute protection of the carrier, and thus far the carrier is an insurer of his safety, to wit, from such assaults or insults at the hands of its servants.

"The company cannot evade liability on this score on the ground that it did not authorize the driver to assault passengers, for, as long as the driver purports to be acting in or about the company's business in transporting passengers, collecting fares, or the like, no express authority to do the particular acts done need be shown."

The contract of carriage here admittedly was on a charge basis of $1.50 an hour, the passenger to be carried to the Orient Hotel, and from there to his home, the cab to wait for plaintiff at the hotel, the amount of the fare being based on time, rather than on the distance traveled. At the time of the alleged assault the contract of carriage had not been completed, and the status of carrier and passenger still was in effect. That the collection of the balance of the fare at the time of the assault or at the end of the journey was within the scope of the employment of Bethune cannot be questioned. There was no refusal by plaintiff at any time to pay this balance. He objected to Bethune's attempt to go into his pocket for the money, and urged him to step into the hotel, where he would pay him the balance. When we recall that this was at 12:20 in the morning, there very well may have been good reasons why he did not want the taxi driver to go through his pockets, out on the sidewalk, particularly in view of his physical

condition. Moreover, the taxi driver, under plaintiff's contract of carriage, was required to wait and take him to his home. To request the taxi driver, under these circumstances, to step into the hotel to receive the balance of the fare was not unreasonable, and the treatment received by plaintiff from the taxi driver—attacking and beating him with a blackjack—certainly was not such respectful and decorous conduct as is required from an employee of a common carrier toward a passenger. The obligation due the passenger against misconduct of the taxi driver clearly was violated.

 The cases cited by counsel for Marlar rest primarily upon treatment of a passenger by an employee of the carrier, where the passenger refuses to pay or, in effect, is a trespasser. This is not such a case. Here the status of passenger and carrier continued to exist during and after the assault. There is here no evidence of fraud or self-defense. Clearly, plaintiff's evidence, whether true or not, was sufficient to warrant submission of the case to the jury, and the granting of defendant's motion for a nonsuit was error.

[4] Error also is assigned to the refusal of the court to permit plaintiff to show that the sixty cents paid by him at the commencement of the journey was substantially more than is reasonable for a trip from Fourth avenue and Broadway to the Orient Hotel. The court rightly held this evidence, under the circumstances, to be immaterial. If, on a retrial, defendant should assert a different contract of carriage than that to which plaintiff testified, such evidence may become material.

The judgment is reversed and the case remanded for a new trial.

Mr. Chief Justice Hilliard and Mr. Justice Francis E. Bouck concur.